UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                                    Chapter 7

AARM CORP.,
                                                                              Case No. 02-14232(PCB)
                                   Debtor.
--------------------------------------------------------x

IAN J. GAZES, as CHAPTER 7 TRUSTEE,

                                   Plaintiff,                      Adv. Pro. No. 04-04408

             -against-

ROSENTHAL & ROSENTHAL, INC.,

                                   Defendant.
--------------------------------------------------------x

APPEARANCES:

Ian J. Gazes
Attorney for Chapter 7 Trustee
32 Avenue of the Americas, 27th Fl.
New York, New York 10013
By: Ian J. Gazes, Esq.

Toback, Hyman & Bernstein LLP.
Attorneys for the Defendant
500 Fifth Avenue
New York, NY 10110-0095
By: Arthur M. Toback, Esq.


BEATTY, PRUDENCE CARTER, U.S.B.J.

**MEMORANDUM DECISION**

Rosenthal & Rosenthal, Inc. ("Rosenthal"), the defendant in this adversary proceeding, has filed a motion for partial summary judgment.[1] The Chapter 7 Trustee (the "Trustee") has opposed the motion although he has consented to judgment in favor of Rosenthal concerning certain of the alleged transfers in the amount of $18,8886.03 he had alleged to be voidable.

For the reasons which follow, the Court grants the motion.

## STATEMENT OF FACTS

An involuntary Chapter 7 petition was filed against AARM Corp. (the "Debtor") on August 29, 2002. An order for relief was entered on November 19, 2002. The Trustee was appointed thereafter.

The Trustee's complaint in this adversary proceeding has six counts. Count I seeks to avoid certain transfers, including the grant of a lien on inventory, as preferential transfers under Bankruptcy Code ("Code") § 547(b);[2] Count II seeks to avoid the inventory lien as well as transfers from the sales of certain inventory as fraudulent transfers under Code § 548(a); Count III seeks to recover $243,000 paid to Rosenthal as avoidable post-petition transfers under Code § 549; Count IV seeks to recover under Code § 550(a), $472,839.26 from Rosenthal, the difference between $243,000 and the higher amount sought being the alleged actual value of the inventory; Count V seeks turnover of $243,000 as property of the estate under Code §§ 547 or 548 on the grounds that Rosenthal's inventory security interest is avoidable as a preferential transfer or fraudulent conveyance; and Count VI seeks disallowance under Code § 502(d) of any claim of Rosenthal until such time as Rosenthal pays to the Trustee

---

[1] The only claim not covered by the motion for partial summary judgment is the one to recover about $4,000 as a preference.

[2] All references to the Code are the Code in effect prior to October 2005.

the amount of all voidable transfers and the value of the inventory. Rosenthal's answer denies the material allegations of the complaint.

Rosenthal entered into a factoring agreement with the Debtor on May 3, 1999 (the "Factoring Agreement"). Andrew Sorger ("Sorger"), the former president and owner of the Debtor, personally guaranteed the Factoring Agreement. The claims asserted by the Trustee arise out of transactions that occurred on the 90th day before the filing of the involuntary petition or thereafter.

As of May 31, 2002, the 90th day pre-petition, records show that Rosenthal had factored receivables in the amount of $4,795,973 against which the Debtor then owed Rosenthal $3,198,065. Affidavit of David Ringer sworn to June 13, 2005 ("Ringer Affidavit") at ¶10.[3] Assuming the validity of all the receivables at that date, Rosenthal would have been oversecured by $1,597,908. In fact, however, $1,203,463 of the May 31 receivables were uncollectible, leaving Rosenthal still oversecured but only by about $400,000. Affidavit of Jerry Sandak, Senior Vice President of Rosenthal sworn to July 14, 2005 at ¶23 ("Sandak Affidavit").

In June, July and August 2002 Rosenthal made additional advances to the Debtor of $2,313,523. Sandak Affidavit at ¶23.

It is undisputed that on August 16, 2002, Rosenthal made a substantial number of adjustments to the Debtor's account resulting in total charge-backs of $2,065,006. At that time the Debtor owed Rosenthal $2,454,558 but held "good" receivables totaling only $2,171,869. Between August 20, 2002 and the petition date, the Debtor sold inventory to a long-time customer, TMI Holdings, generating additional receivables of $230,845.26, the proceeds of which were assigned to and paid to Rosenthal.

---

[3] David Ringer, a certified public accountant, is a member of Eisner LLP, the accountants to the Trustee.

There were several reasons for the major adjustments made on August 16. First, Rosenthal had learned in June 2002 that at least one receivable on which it had made an advance to the Debtor was false - - the customer had never ordered any goods and no goods were shipped. Following additional telephone calls to the Debtor's customers, Rosenthal learned that at least three of them had set-offs or claims owed to them by the Debtor equal to the amount owed to the Debtor. In other words, the Debtor had assigned to Rosenthal, for advances, receivables which the Debtor knew would never be paid.

In late July or early August Rosenthal hired an accounting firm to further research the Debtor's receivables. The accounting firm determined that there were additional phony receivables where no goods had been ordered or shipped. Rosenthal made the August 16 adjustments based on all of its recently acquired information. There is no dispute that the receivables making up the August 16 charge-back were false or subject to offset. The Debtor's conduct in obtaining advances on these receivables was a serious violation of the Factoring Agreement

The Trustee relies on the Ringer Affidavit to establish that Rosenthal was partially unsecured on the 90th day before the involuntary petition was filed. The Ringer Affidavit states that "because of the dollar amount of the adjustments, the adjustments to the account were unlikely to have all arisen on August 16, 2002." Ringer Affidavit at ¶11. Based on that assumption Ringer then goes on to conclude that all of the adjustments must predate the 90th day. Ringer asserts based on this assumption that "Rosenthal would have been an unsecured creditor in the amount of approximately $425,000 as of May 31, 2002, in the amount of $248,883 as of August 27, 2002 and in the amount of $290,858 as of the filing date." Id. at ¶11. Ringer concludes that Rosenthal therefore improved its position as a secured creditor by $177,000.

4

Rosenthal does not dispute the conclusion in the Ringer Affidavit that the adjustments did not arise on August 16, 2002, the date they were entered on Rosenthal's books. Rosenthal does demonstrate, however, without any contradiction by the Trustee, that when the adjustments are properly allocated to the pre and post 90th day that it was fully secured on the 90th day pre-petition. The Sandak Affidavit contains a detailed reply to the unsupported assertions in the Ringer Affidavit and includes a detailed and documented analysis of each element of the August 16 $2,065,000 charge-back. Since no sur-reply has been filed, the indisputable elements of the Sandak Affidavit are accepted. Of particular significance is ¶25 which specifically identifies $862,669.59 of the total charge-backs that were based on invoices dated <u>subsequent</u> to May 31, 2002. Since those charge-backs could not have occurred as early as May 31, 2002 as Ringer assumed, Ringer's conclusion is wrong and Rosenthal was fully secured on the 90th day pre-petition.

The Trustee has also claimed that Rosenthal improperly forced the sale of inventory valued at $450,000 for only $243,000. Although in possession of the Debtor's books and records, the Trustee has not supplied any records with respect to the inventory that would show, e.g., the purchase price paid by the Debtor, how long the inventory had been held, where it was located, what quantities or types of inventory existed or the Debtor's standard mark-up.

The only evidence the Trustee offers is the Sorger Affidavit in which Sorger asserts that six sales in the aggregate amount of $230,845.26[4] were made "at a discounted price to expedite a sale." However, nowhere does Sorger, the Debtor's president, shareholder and guarantor of the Rosenthal debt, and the person in the best position to quantify any discount with specific details, do so. The Trustee's vague attempt to relate sales prices to prior sales of similar inventory at other times is inadequate to establish actual value in light of the

---

[4] Invoices 4302, 4305, 4296, 4297, 4294 and 4295.

5

detailed analysis supplied in the Sandak Affidavit.  The Sandak Affidavit makes clear that certain comparisons used by the Trustee are to prices used by the Debtor on phony receivables and that others were a maximum of 13% off of the Debtor's prior top sales prices.

Sorger principally concerns himself in his affidavit with stating that Rosenthal "demanded" that the Debtor sell off all remaining inventory to reduce its liability to Rosenthal. Sorger Affidavit at ¶4.  Nowhere does Sorger state that Rosenthal dictated the customers to whom the merchandise was to be sold or the price at which the goods were to be sold. Nor does he indicate that Rosenthal ever took possession of or "foreclosed on" the inventory.

It is undisputed that on July 17, 2002, the Debtor granted Rosenthal a lien on its inventory at Rosenthal's insistence.  Rosenthal also pressured Sorger at the meeting held on that date as well as thereafter to provide substitute accounts for the ones found to be false or uncollectible.  However nothing in any of the affidavits submitted by the Trustee even suggests that Rosenthal foreclosed on the Debtor's inventory.  The affidavits by both parties make clear that it was the Debtor who procured the buyers for its own inventory.  Sorger's Affidavit attempts to characterize the late August sales to TMI, one of its regular customers, as unusual and out of the ordinary course of business  because the terms were 180 days rather than a more customary 30, 60 or 90 days.  However, these were the terms fixed by the Debtor for sales made at a time when its business was on the verge of collapse and it had been caught "red-handed" by Rosenthal in improper conduct with respect to a substantial dollar amount of receivables.

Rosenthal did not involve itself in any fashion in the actual process of selling the Debtor's remaining inventory.  The only thing that Rosenthal did was to accept the TMI receivables to which it had a right under the Factoring Agreement because it was satisfied with

6

TMI's credit without providing new advances to the Debtor. Thereafter it collected the proceeds of the receivables and applied them against the Debtor's debt to it.

## DISCUSSION

Rosenthal has made a motion for partial summary judgment. Bankruptcy Rule 7056 makes Rule 56 of the Federal Rules of Civil Procedure ("Rule 56") applicable in adversary proceedings. Rule 56 (c) provides that summary judgment "shall be rendered forthwith if the pleadings * * * together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences. In re CIS, 214 B.R. 108, 118 (Bankr. S.D.N.Y. 1997). When ruling on a motion for summary judgment, the court is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment. Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 36 (2d Cir. 1994). The court can consider the content of all submitted affidavits in determining whether a proponent's affidavit is sufficient to give rise to a dispute as to material issue of fact. See Rule 56(e); In re CIS, 214 B.R. at 118. The nonmoving party is required to put forth all of its evidence or risk the grant of the motion for summary judgment.

In reviewing a motion for summary judgment a court must distinguish between actual evidence in support of the position taken by the opponent of the motion and mere supposition that such evidence might or does exist. The Trustee has not requested any additional discovery. Thus, the court concludes that the Trustee has put forward his best evidence.

7

The Trustee is pursuing the majority of his claims against Rosenthal based on an assertion that Rosenthal was undersecured on the 90th day pre-petition and improved its position during the 90 day preference period. These claims by the Trustee fail as a factual matter because as set forth in the findings of fact Rosenthal was fully secured on the 90th day pre-petition. The grant of the inventory lien during the 90 day period is irrelevant since Rosenthal never made any use of the newly-granted lien.

Code §547(c)(5) provides that a trustee may not avoid a transfer under this section that "creates a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interests for such debt" on the 90th day pre-petition (or certain other dates not here relevant). This section was adopted in the 1978 amendments to the Code and codified the improvement in position test. Fully secured creditors on the 90th day pre-petition are not subject to preference attack, regardless of the amount they subsequently loan or the amount by which the receivables collateral increases. Foxmeyer Drug Co. v. General Electric Capital Corp. (In re Foxmeyer Corp.), 286 B.R. 546, 567-69 (Bankr. Del. 2002); See also Collier on Bankruptcy (15th Ed. Rev. 2006) at ¶547.04[5] at n. 62. Because Rosenthal was fully secured on the 90th day pre-petition the Trustee is not entitled to any preference recovery regardless of the amount of new receivables assigned to Rosenthal. No intermediate points between the 90th day and the petition date are looked at so that any ups and downs of the amount of the debt and the value of the collateral during the 90 days are irrelevant. The only recovery the Trustee could have been entitled to would have been any actual surplus remaining after Rosenthal was paid off, of which there was apparently none.

The Trustee makes much in his papers of the supposedly distress prices that the Debtor received on the last few sales of its inventory and that the terms of the sales were somehow out of the ordinary course of business. However, neither argument carries any weight. Certainly it was not to Rosenthal's advantage for the Debtor's little remaining inventory to be sold at prices that would not pay Rosenthal in full.[5] Nor is there any ordinary course of business idea to be found in the straight forward analysis that Code §547(c)(5) mandates.

The Trustee's claimed "smoking gun" is the grant of the inventory lien on July 17, 2002. However, the Trustee has failed to show that Rosenthal actually made any use of the inventory lien. Rosenthal never "foreclosed" its inventory lien. It never took possession of the inventory, directly or indirectly. Nor did it sell the inventory. The Debtor was responsible for and did sell whatever inventory was sold. The Trustee has offered absolutely no evidence that Rosenthal ever took possession of the Debtor's inventory constructively or otherwise. Therefore setting aside the lien as a preferential transfer will not result in any recovery for the Trustee.

Nor do the Trustee's attempts to characterize his garden variety preference claims as fraudulent conveyance claims fare any better. The Code would require greater, not lesser, proof to recover on a fraudulent conveyance theory. Having failed on preference grounds the Trustee must on the facts of this case necessarily fail on fraudulent conveyance grounds. The other counts of the complaint likewise fall with the failure to recover on the preference counts or lack of proof.

CONCLUSION

---

[5] Likewise as a guarantor of the Rosenthal debt, Sorger should have had an incentive to maximize the recovery on the inventory and thereby minimize his liability.

For the forgoing reasons, the motion of Rosenthal for partial summary judgment is granted.  Settle appropriate order or judgment.


Dated: New York, New York
       September 14, 20007

>/s/ Prudence Carter Beatty
>United States Bankruptcy Judge